JOHN N. CUSHING vs. INHABITANTS OF NEWBURYPORT.

The power of towns to vote and grant money for the support of town schools is not re-
stricted to the amount that is necessary to support the schools which the first five and
the sixtieth sections of c. 23 of the Rev. Sts. require them to support, under a penalty
for refusal or neglect so to do; but they have power to vote and grant money for the
support of other town schools, for instruction in branches of knowledge which the re-
vised statutes do not require to be taught in such schools.

A town, which had raised money for the support of all the schools required by law, and
had supported them, also raised money to support, and did support, a female high
school for the purpose of teaching book-keeping, algebra, geometry, history, rhetoric,
mental, moral and natural philosophy, botany, the Latin and French languages, and
other higher branches of knowledge than were taught in the grammar schools of the
town. Held, that this was a town school, within the meaning of the revised statutes,
and that the money for its support was legally raised by tax.

ASSUMPSIT for money had and received. The case was
submitted to the court on the following statement of facts ·

The town of Newburyport, at its annual meeting in March
1843, voted to raise the sum of $20,000 for town expenses for
the current municipal year, of which sum $7000 was appro-
priated for the support of schools. This sum was assessed
upon the polls and estates of the inhabitants, and collected
and appropriated accordingly. At the same meeting, it was
voted to establish a female high school, with a male instruc-
tor and such assistants as might be necessary, and the select-
men were directed to purchase a site, and proceed to erect a
building for the use of such school.

At the adjourned meeting, held in April 1843, the select-
men were authorized, by vote of the town, to hire a sufficient
sum of money to carry into effect the vote of the town to
establish said school, purchase said site, &c.

Pursuant to the above votes, the selectmen, in the same year,
hired the sum of $6500 on interest, with which they pur-
chased a site, and erected a building thereon for the purpose of
said school, which was organized and put into operation in
the autumn of that year, and has ever since continued in
operation at the town's expense, as a female high school, for
the purpose of teaching book-keeping, algebra, geometry, his-

tory, rhetoric, mental, moral and natural philosophy, botany, the Latin and French languages, and other higher branches of knowledge than are taught in the grammar schools of the town.

During the whole of the years 1843 and 1844, the town had and maintained, by taxes levied as herein stated, the following other separate and distinct schools ; viz. a high school for males, such as is mentioned in § 5 of the 23d chapter of the revised statutes; another English high school, four male grammar schools, six male primary schools, six female primary schools, and three female grammar schools.

The town, at its annual meeting in March 1844, voted to raise the sum of $23·500 for the expenses of the town for the current municipal year, of which sum $6650 was appropriated to the support of all the schools aforesaid, and $850 for the incidental expenses of the school committee, $2000 for the payment of the interest accruing on the town debt, including the sum hired as aforesaid, and $2000 to the reduction of the town debt. The said sum voted was assessed upon the polls and estates of the inhabitants, and collected and appropriated accordingly.

The town, during said years 1843 and 1844, contained more than 4000 inhabitants.

The plaintiff is a citizen of the said town, and resided there in 1843 and 1844, and owned real and personal property there. In 1843, he was assessed, for his proportion of the money voted to be raised that year, the sum of $430·50, which he paid (except the sum of $31·50, which the assessors abated) to the collector, without making any protest. In 1844, the plaintiff was assessed, for his proportion of the money voted to be raised that year, the sum of $365·50, which sum, deducting $21·93, (discount made by vote of the town on payments made in thirty days after the issuing of the tax bills,) he paid to the collector, making a protest, at the time of paying it, that it was an illegal tax, and that he paid it under duress, and not voluntarily.

It was agreed by the parties, that if, upon these facts, the

43 *

court should be of opinion that the action could not be maintained, the plaintiff should become nonsuit ; otherwise, that judgment should be rendered for him.

*Hills*, for the plaintiff.

*Lunt*, for the defendants.

The decision was made at November term 1846.

SHAW, C. J.*   Although the amount involved in the decision of this case is small, it presents a question of great importance to the people of Massachusetts.   The case presented is this :   The inhabitants of Newburyport voted to raise sums of money in the manner provided by law, on the polls and estates of the inhabitants, sufficient to maintain schools for a longer time in each year, for both sexes, and for teaching higher branches of education than the statute of the Commonwealth in terms requires.   To his proportion of the taxes raised for these and other purposes the plaintiff was assessed, and he contends that this portion of the tax was illegal, because the town had no legal authority to raise money for these purposes ; and as the tax was entire, and this part inseparable from the residue, the whole is void; and he seeks to recover it back in this action.

The claim made by the plaintiff in this action is founded upon the principle decided in this Commonwealth in a series of cases, of which *Stetson* v. *Kempton*, 13 Mass. 272, may be considered as a leading one, that towns are corporations of limited powers ; that they cannot vote and assess money upon the inhabitants, for all purposes indiscriminately, but must be confined to the established powers of towns, as settled by positive enactment, or by well defined and ancient usage.   This is undoubtedly a correct principle, and it is important to be adhered to, though it is not easy, in regard to all the powers of towns, to lay down, in the form of an exact definition, what objects are within and what beyond the scope ot those powers.   Should a new power be conferred on a town for the first time, as for instance, to construct and maintain

---

* *Wilde*, J. did not sit in this case.

an acqueduct, or other specific purpose, they must, no doubt, confine themselves to the limits of the power conferred.

In general, the corporate powers of towns have originated in this way: They have been required to provide for certain wants of the community, or to perform certain duties for the common benefit, such as making roads, relieving the poor, supporting schools, and the like, and then, either in express terms, or by necessary implication, they are invested with all the powers necessary to the performance of such duties.

The establishment of schools for the education, to some extent at least, of all the children of the whole people, is not the result of any recent enactment; it is not the growth even of our present constitutional government, or the provincial government which preceded it, but extends back two hundred years, to the early settlement of the colony. Indeed, the establishment of popular schools is understood to have been one of the objects for which powers were conferred on certain associations of persons living together in townships, enabling them to regulate and manage certain prudential concerns in which they had a common interest. The question, therefore, does not depend upon the literal construction of certain clauses in the revised statutes, as if they were the first and only legal enactments on the subject; but regarding them as the revision of a system of provisions, indicating a long course of policy of the government under all its forms, these statutes, *in pari materia,* may justly be resorted to, in ascertaining the true construction of a particular enactment.

Besides; we think that these, and all similar enactments, are to be considered under the strong light cast upon them by the just, and liberal, and enlightened views of the founders of our Commonwealth, in the state constitution, *c. 5,* § 2, as follows: "Wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures

and magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them ; especially the university of Cambridge, public schools, and grammar schools in the towns," &c. Though this provision does not prescribe a precise practical rule, which is usually not within the purpose of a constitution, yet it does announce, in clear and energetic terms, the object of that constitution to establish a free government sustained by an enlightened, intelligent and educated people ; that this should extend, as far as practicable, to all classes of the people ; and for this purpose it is made the duty of the legislature who make the laws, and of the magistrates who may expound them, to cherish the interests of literature (among other means) by public schools and grammar schools, in the towns.

With these general views, let us now turn to the existing provisions of the revised statutes. By c. 15, § 12, it is provided that towns shall have power to grant and vote such sums of money as they shall judge necessary, for various purposes, the first of which is "for the support of town schools." It is contended, on the part of the plaintiff, that as this would give an indefinite power to towns, though no limit is annexed to it at the place where it is found, there must be a limit found in some other parts of the code ; and we are referred to several of the first sections of the 23d chapter. These, it is manifest, are all mandatory, prescribing what towns are compelled to do under the act. By the first five sections, every town having 50 families or householders is required to have a school, each year, equivalent in the aggregate to six months ; every town, having 100 families, a school equivalent to twelve months ; every town having 150 families, a school equivalent to eighteen months ; and every town having 500 families, schools equivalent to twenty four months, together with a high school for all the inhabitants, not less than ten months in each year. These are required under penalty of a fine, imposed by § 60. Here then is the precise question. On the part of the plaintiff, it is contended that these sec-

tions, directing what are the smallest sums which towns must raise, in older to save themselves from the penalties of the law, do also constitute a limit, beyond which towns have no power to raise money for schools. This certainly is not the effect of the terms of this enactment; and whether, upon a just and correct exposition, this is the necessary or natural implication from these provisions, must depend upon other parts of the same chapter, other statutes *in pari materia*, and the general policy indicated by the course of legislation, to determine the true intent and meaning of the legislature in their enactments. The question is, whether the description of schools which towns shall be required to maintain is a description of schools which alone towns, in their corporate capacity, have power to support at the common expense.

The affirmative of this proposition cannot be maintained, because it is inconsistent with other provisions of the revised statutes, with previous and subsequent legislation, and with a practice which has been so extensively adopted, both before and since the revised statutes, as to amount, in some measure, to a practical and contemporaneous legislative exposition of its true intent and meaning. It is inconsistent with the clause first above cited, *c.* 15, § 12, which provides that towns shall have power to raise "such sum of money as they shall judge necessary for the support of town schools." It is urged, however, that if this be construed to be an unlimited power, towns might raise money to support a medical, theological, or law school, or a military school. But this, we think, would not be a just conclusion. They are still to be *town* schools, and designed for general education of all the people ; and what are understood by town schools must be determined by an honest application of the rules of good sense, in ascertaining the meaning of these well known terms, by long established and approved usage, and the known policy of the legislature. There is a clause in Rev. Sts. *c.* 23, § 9, which, if it stood alone, would seem to give some countenance to the argument we are considering. The several towns are thereby authorized and directed "to raise such sums of money, for the

support of the schools aforesaid, as they shall judge necessary." It is, however, to be considered, that this provision, and that in c. 15, § 12, are both affirmative. One gives the power in general terms, the other gives a qualified power. They were both passed at the same time, and may well stand together. But it is not difficult to perceive how both these provisions came to be introduced. In revising the statutes, the commissioners undoubtedly took the former statutes in the order in which they found them, and, with such curtailment and modification as they thought useful, introduced them into their work. And probably, in preparing one provision, it was not always possible to recollect the terms of every other provision having some relation thereto, especially when they were found under different heads in the old statutes. In c. 15, the commissioners were enumerating the powers of towns. They took the provision direct from St. 1785, c. 75, § 7, which provides that towns "may grant and vote such sum or sums of money, as they shall judge necessary for the support of the ministry, schools," &c. Here, by the Rev. Sts. c. 15, § 12, the same power was given. But the provision secondly above cited, Rev. Sts. c. 23, § 9, is taken, nearly in terms, from St. 1826, c. 143, § 4, the statute then in force for the general regulation of schools. If, then, it should be argued, that it was the intention of the makers of St. 1826 to limit and restrain the power of towns as expressed in St. 1785, c. 75, § 7 — an intention which we think cannot be inferred from the terms of it — it is a sufficient answer to say, that such intention was waived, and the former provision restored by being reinstated in terms in the revised statutes.

There is one other clause in Rev. Sts. c. 23, from which it is attempted to support the plaintiff's construction. It is § 6, which provides that "any town, containing less than five hundred families or householders, may establish and maintain such a school, as is first mentioned in the preceding section, for such term of time in any year, or in each year, as they shall deem expedient." It is hence argued, that if towns have the power contended for, this section would be unnecessary. This would certainly seem to be so. But such clauses

are often inserted for greater caution, where the effect is not to introduce a new law, but to remove doubts, and to give greater certainty to such provision. We do not therefore think that the implication arising from this clause can have much effect to control the other parts of the statute.

But the construction contended for seems to be inconsistent with the course of legislation on the subject. The laws made under the colonial and provincial governments were mandatory, and not restrictive. They required towns to go to a certain extent in maintaining schools; but they do not seem to be restrained from going further, either in terms or by implication. Without citing all the ancient statutes, there is one of the province laws, passed in 1768, which appears to me to have a considerable bearing on the question. The date shows that this act passed just as the troubles which preceded the revolution were coming on; and it was probably the last act passed on the subject of schools before the adoption of the constitution. In order to understand the act which I am about to cite, it must be borne in mind that the territory of the State was divided into parishes, commonly, in the law, called "precincts;" and a town often consisted of two or more precincts. It might happen, and probably often did happen, that a town would consist in part of a village or seaport compactly settled, whilst the residue of the town would be thinly settled by agricultural inhabitants, like Newbury or Charlestown, before they were divided, or as Plymouth now is. The compact portion would usually compose a parish, and would be better able to raise money for schools, and desirous of giving their children a better education, with a view to their being employed in trade or navigation, than the residue of the town could well afford. Such being the condition of several towns, the act in question passed, (Anc. Chart. 666,) with this preamble: "Whereas it may happen that, where towns or districts consist of several precincts, some of such precincts may be disposed to expend more for the instruction of children and youth in useful learning, within their own bounds, than, as parts of such towns or districts, they are by law held to do," &c

"and whereas the encouragement of learning tends to the promotion of religion and good morals, and the establishment of liberty, civil and religious," &c. This last preamble was probably thrown in, to intimate to the members of parishes, that though the support of public schools for general education was the proper concern of towns, yet that the purpose was not so alien to that of an institution for religious objects as it would seem to be; since the encouragement of learning, like the more direct means of public worship and religious instruction, which are the objects of a parochial institution, tends to the promotion of religion and good morals, and the security of civil and religious liberty. The statute then goes on to enact, that the major part of the inhabitants may meet and vote to raise any sums for the building and repair of school houses, and the support of schools and schoolmasters, to be assessed and levied like other taxes.

Here it is expressly provided, that a part of the inhabitants of a town may, at their own option, by vote of a majority, levy and assess upon all that class of inhabitants, who come within the description, such sum as they may agree upon, in order to establish better schools than as part of the town they could have. Could it have been the intent of the legislature to authorize a constituent part of a town to levy on themselves a larger amount than they were held by law to do, and yet that the whole body, if they had the ability, should be inhibited from exercising the same power?

Several acts were passed, after the adoption of the constitution, which did not essentially vary the law. I have already cited St. 1785, c. 75, § 7, authorizing towns to vote and assess money "for schools," without limitation. The first direct act on the subject of schools, under the present constitution, was St. 1789, c. 19. It was, like those that preceded it, mandatory and compulsive. This statute, after requiring towns having fifty, one hundred, and one hundred and fifty householders, respectively, to have common schools for a term in the aggregate equal to six months for each fifty householders, requires towns of two hundred householders

to have a grammar schoolmaster, well instructed in the Latin, Greek and English languages, for twelve months, and common schools for twelve months. No higher requisition, as an absolute duty, was imposed on any town, although it should contain any number of hundreds or thousands of householders, beyond two hundred.

What is the just inference to be drawn from this state of the law ? The *St.* of 1785 had already been passed, and was then in force, authorizing towns, in general terms and without restriction, to raise money for the support of schools. May it not be fairly inferred that it was the intent of the legislature simply to designate the lowest grade of schools the support of which should exempt a town from the penalties of the law, leaving to the towns themselves, with the powers already conferred on them, to raise such further amount for the support of schools, according to their own views of their ability, as the numbers to be taught, and the advance of improvement in education, might in their judgment require ? The towns exceeding two hundred families, being the more populous, would in general be the more prosperous and wealthy, and after being required to keep a grammar school for instruction in the languages, and a given number of common schools, it might be well considered by the legislature that such towns could safely be entrusted, with the discretion of making a voluntary provision for such other schools as their wants might require.

Various acts were passed, from time to time, especially upon the subject of school districts, but no grand revision of the whole law was made, until the statute of 1826, *c.* 143. This, like the former, required towns of fifty, one hundred, and one hundred and fifty householders, respectively, to maintain common schools, for six, twelve and eighteen months, and further required cities and towns of five hundred householders to maintain such common schools, for a term in the aggregate equal to twenty four months ; and, in addition thereto, an English high school ; and cities and towns containing four thousand inhabitants were required to

have an instructor in the Latin and Greek languages, history, rhetoric and logic. These requisitions were enforced by penalties. But no greater requisition was made on towns having more than five hundred householders, and four thousand inhabitants. This act was passed at a time when there were many towns in the Commonwealth having more than four thousand inhabitants; it was in force till the adoption of the revised statutes; and its provisions were thereby substantially reënacted. Could it have been intended to restrain the populous and wealthy towns, however large and able, and without regard to the number to be instructed, to the meagre provision of twenty four months of common schools, and one grammar school?

Some other acts, making special provisions or slight alterations in the appropriation of the money required to be raised, seem to carry the implication that, although the amount to be raised shall not be diminished, there is no restriction upon its enlargement. *St.* 1823, *c.* 111, (since repealed,) provided that towns of five thousand inhabitants, at their option, instead of an instructor in languages, might have an English high school, or apply the whole of the money required to be raised for such school to the support of the district schools; but it was with this proviso, " that no town shall avail itself of any of the provisions of this act, so as to diminish the term of time of public schools which such town is by law now required to maintain."

*St.* 1828, *c.* 128, made a somewhat similar provision as to the appropriation of the money, but with the still more significant proviso, that such sum or sums should not be less than the highest sum which had been raised by such town within the four years last past. It carefully provided a minimum, and that not regulated by the requisitions of the statute, but by the previous conduct of the town ; but it indicated no maximum of the sum to be raised.

Such being the state of the law when the revised statutes were passed, we think an argument of some weight may be drawn from the practical construction put upon these enact-

ments by the larger towns; perhaps it may be safely said, by most of the towns of the Commonwealth. The sum required to be raised not being proportioned to the numbers to be educated, it must have been as manifest to towns as to the legislature, that a provision quite adequate to the exigencies of one town would be quite inadequate to those of another. And it is believed that the cities and larger towns have uniformly, and for years, raised more money than they could be required to raise by the provisions of the statute. And as it cannot be presumed that they have purposely acted in violation of the law, they must have acted on the assumption that, as the true construction of the statute, though they were bound to raise the sum for schools to the amount specified, they were not restrained from raising more.

We are aware that, as a general rule, practice under a statute is not a very safe rule of exposition. An erroneous construction may have been hastily or carelessly adopted by one, been followed by others, and become to a considerable extent general. But when a particular provision of law, constituting part of a highly important and much cherished system of policy, was early passed, and received a practical construction, and was afterwards repeatedly reënacted, in connexion with other provisions, without alteration of its terms, the legislature, knowing what construction has been put upon it, must be presumed to have intended that it should be understood and applied as it had been long understood and applied; so that a practice, under such circumstances, becomes a just exponent of the true meaning and object of the law. In connexion with this view, it is proper to add, that provision was made by *St.* 1825, *c.* 170, and *St.* 1826, *c.* 143, and *St.* 1838, *c.* 105, that full returns should be annually made, by every town, to the government, specifying the amount of money raised, the number of schools kept, the aggregate of time, number of pupils, &c.; so that the manner in which the existing law was understood and executed was well known to the legislature.

There is one other consideration, leading to the same result, which deserves some notice. The course of policy seems to have been, to encourage towns to liberal appropriations for the support of schools. But according to the argument of the plaintiff, there would be no scope for liberality. Indeed there would be no room on the part of towns for deliberation or choice. According to the argument, towns are compellable by law to raise a certain sum ; by another provision of law, this sum is the measure and limit of the amount which the town has power to raise, and any tax for a larger sum would be illegal. By *Sts.* 1839, *c.* 56, and 1841, *c.* 17, provision is made for the distribution of the school fund. It is to be apportioned among towns, according to the number of persons therein between the ages of four and sixteen years ; but it is with this express restriction, that no such apportionment shall be made to any town, which shall have failed to raise by taxation a sum equal at least to $1·25 for each person between those ages. Now, whether this would exceed, or not, the amount necessary to support the common and grammar schools, as required, it establishes a different rule, and may exceed it. Indeed, in the larger towns, it must exceed it. Besides ; the law, by the terms " at least $1·25," implies that they may raise more. And it would be strange so to construe several laws, made *in pari materia*, that whilst one holds out a benefit to towns, to aid and assist them in the great purpose of education, it cannot be enjoyed, because it would be a violation of another.

On the whole, the court are of opinion, that the provision in the revised statutes, which provides the small amount of schooling which towns are compelled to provide for under a penalty, is not a definition or limit of the public schools which they have authority to provide for by taxation ; but that the provision is to be taken in connexion with the broader power given to towns to grant and vote money, as they shall judge necessary, for the support of schools, and also with the whole course of policy and of legislation on the same subject. This power is to be exercised in good faith

for the support of "town schools," as that term is well known and understood, for the common and general benefit, and not colorably for the promotion of other and different objects. In the agreed statement of facts, it appears to the court that the schools established by the town of Newburyport, though extending to instruction in branches of knowledge beyond those required by the statutes, were yet *town schools,* within the proper meaning of that term, provided for the benefit of all the inhabitants; that the taxes levied for the support of them, in common with other town charges, were not illegal; that the plaintiff, in paying his just proportion of them, was not illegally taxed, and cannot maintain his action to recover back the amount paid.

*Plaintiff nonsuit.*